FILED

MAY 1 0 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

CASE NUMBER 1:06CV00889

Civi JUDGE: Ellen Segal Huvelle

DECK TYPE: General Civil

DATE STAMP: 05/10/2006



| | |
|---|---|
| GARY BOLAND, 4500 Steiner Ranch Blvd., No. 3221, Austin, Texas 78732, On Behalf of Plaintiff and All Others Similarly Situated, <br><br> Plaintiff, <br><br> vs. <br><br> XM SATELLITE RADIO HOLDINGS INC., AND HUGH PANERO, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

**CLASS ACTION COMPLAINT
FOR VIOLATIONS
OF FEDERAL SECURITIES LAWS**

**JURY TRIAL DEMANDED**

Plaintiff, individually and on behalf of all other persons similarly situated, by plaintiff's undersigned attorneys, for plaintiff's complaint against defendants, alleges the following based upon personal knowledge as to plaintiff and plaintiff's own acts, and upon information and belief as to all other matters, based on, *inter alia*, the investigation conducted by and through plaintiff's attorneys, which included, amongst other things, a review of the defendants' press releases, Securities and Exchange Commission ("SEC") filings by XM Satellite Radio Holdings Inc. ("XMSR" or the "Company") and media reports about the Company. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**NATURE OF THE CASE**

1.    This is a securities class action on behalf of plaintiff and all other persons or entities, except for defendants, who purchased or otherwise acquired XMSR securities (the "Class") during the period July 28, 2005 through February 15, 2006, inclusive (the "Class Period"), pursuing remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

- 1 -

## JURISDICTION AND VENUE

2.     Jurisdiction is conferred by § 27 of the Exchange Act.  The claims asserted herein arise under §§ 10(b) and 20(a) of the Exchange Act and Rule 10b-5.

3.     Venue is proper in this District pursuant to § 27 of the Exchange Act.  The corporate headquarters of XMSR are located in the District.

4.     In connection with the acts and conduct alleged herein, defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including the United States mails and the facilities of the national securities exchanges.

## PARTIES

5.     Plaintiff, as set forth in the accompanying certification, incorporated by reference herein, purchased shares of XMSR stock at artificially inflated prices during the Class Period, as described in the attached certification, and was damaged thereby.

6.     Defendant XMSR, a Delaware corporation operates as a satellite radio service company primarily in the United States. It provides music, news, talk, information, entertainment and sports programming for reception by vehicle, home and portable radios, as well as over the Internet to approximately 6 million subscribers. The company provides XM NavTraffic, a satellite traffic data service that provides real-time traffic information, and XM WX satellite weather service that offers graphical data weather service to the marine and aviation markets. XMSR also offers XM Radio for the automobile industry. In addition, it provides online service, including: online music purchase and playlist management capability. As of January 31, 2006, XMSR operated approximately 160 channels, including 67 commercial-free music channels; 34 news, talk, and entertainment channels; 39 sports channels; 21 instant traffic and weather channels; and 1 emergency alert channel. The company markets its services through various

distribution channels, including automotive manufacturers and dealers, national and regional electronics retailers, car audio dealers and mass retailers and rental car companies. The Company's principal corporate offices are located at 1500 Eckington Place NE, Washington, DC 20002-2194.

7.      Defendant Hugh Panero ("Panero") was, at all relevant times, President, Chief Executive Officer and a Director of XMSR. During the Class Period, defendant Starks *sold 413,334 shares of XMSR stock, for proceeds of $11.9 million.*

8.      Defendant Panero, because of his position with the Company, possessed the power and authority to control the contents of XMSR quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. Defendant Panero was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of his positions and access to material non-public information available to him but not to the public, he knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations that were being made were then materially false and misleading.

## SCIENTER

9.      In addition to the above-described involvement, as CEO of the Company, Defendant Panero had knowledge of XMSR's problems and was motivated to conceal such problems.  Defendant Panero provided for financial reporting and communications with the market. Communications with the market, including conference calls, as well as internal reports showing XMSR's forecasted and actual growth, were prepared under his direction. Defendant

- 3 -

Panero sought to demonstrate that he could lead the Company successfully and generate the growth expected by the market. Defendant Panero also owed a duty to the Company and its shareholders not to trade on inside information.

**FRAUDULENT SCHEME AND COURSE OF BUSINESS**

10.     Defendants are liable for (a) making false statements, *or* (b) failing to disclose adverse facts known to him about XMSR. Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of XMSR's publicly traded securities was a success, as it: (a) deceived the investing public regarding XMSR's prospects and business; (b) artificially inflated the prices of XMSR's publicly traded securities; (c) permitted insiders, including defendant Panero, *to sell 2.7 million shares of XMSR stock at inflated prices, for proceeds of $79.1 million;* and (d) caused plaintiff and other members of the Class to purchase XMSR's publicly traded securities at inflated prices.

**SUBSTANTIVE ALLEGATIONS**

11.     On or before July 28, 2005, defendants entered into a conspiracy and scheme to disseminate false and misleading statements to the investment community regarding the Company's ability to reduce its subscriber acquisition costs, as the Company attempted to rapidly accelerate its growth of total subscribers through the end of 2005.

12.     From a time prior to the beginning of the Class Period, defendants relied on a bewildering nest of poorly defined home-cooked metrics that did not comply with Generally Accepted Accounting Principles ("GAAP") measures, geared to their subscription-based business. These poorly defined metrics and measures are prone to manipulation and therefore highly suspect. In fact, defendants relied heavily on their own definitions and interpretations of them, to purport the progress and prospects of their unprofitable business, as described in the Company's SEC Form 10-Q for the quarter ending March 31, 2005, which stated in part:

- 4 -

Overview

The highlights for our three month period ended March 31, 2005 include the following:

• growing the XM business to over 3.7 million subscribers at quarter end, including over 0.5 million new subscribers added during the three months;

• the continued development of innovative retail products at attractive price points and broad OEM factory-installed penetration across numerous vehicle models;

• launching the dedicated 24/7 Major League Baseball channel, MLB Home Plate, as well as expanding our talk content to include shows hosted by Tony Kornheiser, Dr. Laura and G. Gordon Liddy and our sports programming line-up with the Indy Car Series and the PGA Tour;

• ending March 31, 2005, with a recurring subscription revenue run rate of $394 million per year; and

• *continuing to grow our gross margin* (calculated as revenues less variable costs, which include revenue share & royalties, customer care & billing operations, cost of merchandise & ad sales) during the three months ended March 31, 2005 *while reducing our costs to acquire each new subscriber.*

*The key metrics we use to monitor our business growth and our operational results are: ending subscribers, Average Monthly Subscription Revenue Per Subscriber ("ARPU"), Subscriber Acquisition Costs ("SAC"), Cost Per Gross Addition ("CPGA") and EBITDA, presented as follows:*

\*\*\*

*(3) Ending subscribers—We consider subscribers to be those who are receiving and have agreed to pay for our satellite audio service, either by credit card or by invoice, including those that are currently in promotional periods paid in part by vehicle manufacturers, as well as XM activated radios in vehicles for which we have a contractual right to receive payment for the use of our satellite audio service. Radios that are revenue generating are counted individually as subscribers. Promotional periods generally include the period of trial service plus 30 days to handle the receipt and processing of payments.*

*(4) Average Monthly Subscription Revenue per Subscriber—Please see definition and further discussion under Average Monthly Subscription Revenue Per Subscriber on page 16.*

*(5) SAC—Please see definition and further discussion under Subscriber Acquisition Costs on page 19.*

*(6) CPGA—Please see definition and further discussion under Cost Per Gross Addition on page 19.*

*(7) EBITDA—Please see definition and further discussion under EBITDA on page 20.*

- 5 -

\*\*\*

*We will continue to incur operating losses until we substantially increase the number of our subscribers and increase our cash flow sufficient to cover operating costs.* We are focused on increasing subscribers and scaling our business while managing growth and containing costs. We also have significant outstanding contracts and commercial commitments that need to be paid in cash or through credit facilities over the next several years, including to fund subsidies and distribution costs as well as revenue share arrangements, under which our payments increase as our revenues increase under the terms of those agreements, particularly under our arrangement with General Motors, programming costs, including Major League Baseball, repayment of long-term debt, lease payments and service payments. *Our ability to become profitable also depends upon other factors identified below under the heading "Liquidity and Capital Resources— Future Operating Liquidity and Capital Resource Requirements."*

\*\*\*

(1) Net loss before interest income, interest expense, income taxes, depreciation and amortization is commonly referred to in our business as "EBITDA." *EBITDA is not a measure of financial performance under generally accepted accounting principles.* Consistent with regulatory requirements, EBITDA includes Other Income (Expense). We believe EBITDA is often a useful measure of a company's operating performance and is a significant basis used by our management to measure the operating performance of our business. Because we have funded and completed the build-out of our system through the raising and expenditure of large amounts of capital, our results of operations reflect significant charges for depreciation, amortization and interest expense. EBITDA, which excludes this information, provides helpful information about the operating performance of our business, apart from the expenses associated with our physical plant or capital structure. EBITDA is frequently used as one of the bases for comparing businesses in our industry, *although our measure of EBITDA may not be comparable to similarly titled measures of other companies. EBITDA does not purport to represent operating loss or cash flow from operating activities, as those terms are defined under generally accepted accounting principles, and should not be considered as an alternative to those measurements as an indicator of our performance.* The reconciliation of net loss to EBITDA is as follows (in thousands):

(2) *We consider subscribers to be those* who are receiving and have agreed to pay for our satellite audio service, either by credit card or by invoice, *including those that are currently in promotional periods paid in part by vehicle manufacturers,* as well as XM activated radios in vehicles for which we have a contractual right to receive payment for the use of our satellite audio service. Radios that are revenue generating are counted individually as subscribers. *Promotional periods generally include the period of trial service plus 30 days to handle the receipt and processing of payments.*

\*\*\*

*Subscriber Acquisition Costs.* We consider subscriber acquisition costs to include radio manufacturer subsidies, certain sales, activation and installation commissions, and hardware-related promotions. These costs are reported in Subsidies & Distribution. The negative margins from equipment

*sales are also included in subscriber acquisition costs. Subscriber acquisition costs do not include on-going loyalty payments to retailers and distribution partners, payments under revenue sharing arrangements with radio manufacturers and distributors and certain guaranteed payments to GM.* During the three months ended March 31, 2005 and 2004 we incurred SAC expenses of $43.7 million, and $31.8 million, respectively. SAC for the three months ended March 31, 2005 and 2004 was $52 and $67, respectively. The decline in SAC for the three-month period ended March 31, 2005 as compared to the three month period ended 2004 is due to the combined impacts of the decline in manufacturer subsidies and the increase in the number of activations. The timing of promotions and new contracts may cause SAC to fluctuate from period to period. We expect SAC to decline in 2005 as compared to 2004.

Advertising & Marketing. Activities comprising these expenses include media, advertising, events and direct marketing programs. Advertising & marketing costs were $26.2 million during the three-month period ended March 31, 2005, compared with $14.7 million during the three-month period ended March 31, 2004, an increase of $11.5 million. The increase is primarily due to our increased retail marketing and media advertising expenses.

*Cost Per Gross Addition. We consider CPGA to include the amounts in SAC, as well as advertising, media and other discretionary marketing expenses. In our condensed consolidated financial statements, SAC costs are captured in Subsidies & Distribution and the negative margins from equipment sales, while CPGA costs are primarily captured by the combination of Subsidies & Distribution, Advertising & Marketing, plus the negative margins from equipment sales. CPGA does not include marketing staff (included in Retention & Support) or the amortization of the GM guaranteed payments (included in Amortization of GM Liability).* During the three-month periods ended March 31, 2005, and 2004, we incurred CPGA expenses of $74.1 million and $50.2 million, respectively. CPGA for the three-month periods ended March 31, 2005 and 2004 was $90 and $106, respectively. CPGA declined for the three-month period ended March 31, 2005 as compared to the three-month period ended March 31, 2004 primarily due to the combined impacts of subscriber additions increasing at a faster rate than our discretionary advertising and marketing expenses as well as the change in the mix of subscribers acquired. The timing of our media campaigns and discretionary advertising spending may cause CPGA to fluctuate from period to period. The costs to acquire subscribers vary by distribution channel, and a change in the mix of subscribers from higher cost distribution channels to lower cost distribution channels will have a favorable impact on CPGA. We expect CPGA to decline in 2005 as compared to 2004.

\*\*\*

Net Loss. Net loss for the three-month period ended March 31, 2005 was $119.9 million, compared with $170.1 million for the three-month period ended March 31, 2004, a decrease of $50.2 million. The decrease primarily reflects the growth in our revenue and decreases in the provision for deferred income taxes and interest expense, offset in part by an increase in operating expenses due to our subscriber growth.

\*\*\*

**Materially False and Misleading Statements**

**and Omissions During the Class Period**

13.    On July 28, 2005, the Company issued a press release, entitled "XM SATELLITE

RADIO HOLDINGS INC. ANNOUNCES SECOND QUARTER 2005 RESULTS AND

INCREASES YEAR-END SUBSCRIBER GUIDANCE TO 6 MILLION - $125 Million in

Revenues More than Double Prior Year Period Ends Quarter at 4.4 Million Subs with 647,226

Net Subscriber Additions." The press release stated in part:

> Washington D.C., July 28, 2005 -- XM Satellite Radio Holdings Inc.
> (NASDAQ: XMSR) today reported financial and operating results for the second
> quarter ended June 30, 2005. *For the quarter, XM reported revenue of $125
> million, an increase of 136 percent over the $53 million reported in the second
> quarter 2004. The significant revenue growth was driven by record second
> quarter net subscriber additions of 647,226, a 55 percent increase over the
> 418,449 subscribers added in the second quarter 2004. XM ended the quarter
> with 4,417,490 subscribers compared with 2,100,352 subscribers reported for
> the second quarter 2004.*
>
> *With XM's first half performance and an even stronger outlook for the
> second half of the year, XM is increasing 2005 subscriber guidance from 5.5
> million to 6 million ending subscribers.*
>
> *XM's net loss for the second quarter 2005 was ($146.6) million, as
> compared to ($166.1) million in the second quarter 2004. XM reported an
> EBITDA loss of ($89.9) million for the second quarter 2005 compared to
> ($107.8) million for the second quarter 2004.* XM's net loss and EBITDA for the
> second quarter 2004 each included a ($35.0) million charge for de-leveraging
> activities.
>
> Efficient Quarterly Subscriber Growth
>
> XM's second quarter subscriber growth was strong across both the retail
> aftermarket and automotive distribution channels. Second quarter 2005 Cost Per
> Gross Addition (CPGA) was $98, an improvement of $3, or 3 percent, from the
> $101 CPGA reported in the second quarter 2004. XM's CPGA is the fully-loaded
> cost to acquire each new subscriber, including Subscriber Acquisition Costs
> (SAC) of $50, as well as advertising and marketing expenses.
>
> ***

14.    On September 27, 2005, defendants issued a press, entitled "XM SATELLITE

RADIO TOPS FIVE MILLION SUBSCRIBERS." The press release stated in part:

Washington D.C., September 27, 2005 -- XM Satellite Radio today announced that it recently surpassed 5 million subscribers, increasing its lead as the nation's number-one satellite radio company.

"With more than five million subscribers today, XM continues to expand its position as the leader in the satellite radio industry," said Hugh Panero, XM Satellite Radio President and CEO. "We are on track to have more than six million subscribers by the end of this year. Consumers are choosing XM because we offer the most choices, including the most commercial-free music and live sporting events, and the most advanced technology. *With the winning combination of outstanding new channels and breakthrough products in advance of the holiday season, XM is poised for record growth during the fourth quarter."*

*** 

15.    On October 28, 2005, defendants issued a press release, entitled "XM SATELLITE RADIO HOLDINGS INC. ANNOUNCES THIRD QUARTER 2005 RESULTS AND REAFFIRMS 6 MILLION SUBSCRIBER GUIDANCE - Revenues up 134% to $153 million in third quarter, compared to prior year period; Subscribers double to 5,034,642 from prior year; Expands lead with 617,152 net additions - GM and Honda to produce more than 2 million 2006 XM-equipped vehicles." The press release stated in part:

Washington D.C., October 27, 2005 -- XM Satellite Radio Holdings Inc. (NASDAQ: XMSR) today reported financial and operating results for the third quarter ended September 30, 2005. XM ended the quarter with 5,034,642 subscribers, *doubling the 2,516,023 subscribers reported last year for the third quarter.* The growth was driven by third quarter net subscriber additions of 617,152, a 48 percent increase over the 415,671 net subscribers added in the third quarter 2004. Given its strong performance in the first three quarters, XM reaffirms its guidance of exceeding 6 million subscribers by the end of 2005.

*XM's net loss for the third quarter 2005 was ($131.9) million, as compared to ($118.0) million in the third quarter 2004. XM reported an EBITDA loss of ($73.8) million for the third quarter 2005 compared to a third quarter 2004 loss of ($62.9) million.*

*Record Revenue from Cost-Effective Subscriber Growth*

*For the quarter, XM reported revenue of $153 million, an increase of 134 percent over the $65 million reported in the third quarter 2004.* XM's third quarter subscriber growth was driven by strong automotive and retail distribution performance with a range of full-featured products. Subscriber Acquisition Costs (SAC) in the third quarter 2005 were $53, a decrease from the $57 in the third quarter 2004. Cost Per Gross Addition (CPGA) in the third quarters of both 2005 and 2004 was $89. XM products are well stocked for the holiday season and XM expects to accelerate its subscriber and revenue growth through the fourth quarter.

\*\*\*

16.    Immediately following the Company's 3Q:05 press release, defendants conducted

their earnings conference call. During the call, defendant Panero stated in part:

> Good morning and thank you for joining us. On the call with me are Gary Parsons, Chairman, Joe Euteneuer, Chief Financial Officer, Steve Cook, Executive Vice President of Sales and Marketing, and Joe Titlebaum, whom you just heard from. This morning we will review XM's results for the third quarter 2005, *a quarter that exemplified what I'd characterize as the smart subscriber growth the Company has demonstrated quarter after quarter and year after year since we started service in November of 2001.*
>
> We will focus on XM's strong subscriber additions this quarter, including a close look at our positions in both the automotive and retail distribution channels. We will highlight some programming initiatives designed to appeal to new subscribers while ensuring that our current subscribers remain dedicated listeners. Further, we will discuss recent product releases as well as provide an update on our strategic partnerships. Finally, Joe Euteneuer will summarize XM's financial performance, *illustrating how we maintain our market leadership while building a sound business model.*
>
> *The third quarter again demonstrated XM's ability to deliver dramatically-increasing subscriber and revenue growth with the lowest subscriber acquisition cost, or SAC, in the industry. From a strategic standpoint, XM has built a powerful economic engine with both the automotive and retail cylinders hitting in parallel. Our long-term value is in the integrated business elements we have executed, which include advanced products, great brand image, broad cost-effective distribution, lasting partnerships and outstanding content.*
>
> First and foremost during the quarter, XM surpassed the 5 million subscriber milestone in September. It took nearly two years for XM to capture its first million subscribers, which was in itself a record surpassing the early adoption rates of cable TV, the Internet, CD players, and other mass media. Now we are going to add that many subscribers in the current quarter alone.
>
> During the third quarter, XM added 617,152 net new subscribers, ending with a total of 5,034,642 subscribers. Our growth during the third quarter represents 48% more net new subscribers than the 415,671 subscribers added in the third quarter of 2004, and slightly fewer subscribers compared to the 647,226 added in the second quarter of 2005. *Our significant third-quarter subscriber growth occurred in the face of a new rate structure instituted in the prior quarter and a softer market for new car sales.*
>
> XM's subscriber growth rate is reflected in the Company's rapidly increasing revenue, reaching a record 153 million in the third quarter of 2005 with subscription revenue of 140 million. *Third-quarter revenue more than doubled to 65 million in revenue reported in the third quarter of 2004, and is 22% more then the 125 million recorded in the second quarter of this year.*

*The secret to XM's smart subscriber growth rather than growth at any cost is the ability to control marketing and product expenses while rapidly growing subscribers. This quarter, XM kept its fully loaded per-unit costs of capturing a new subscriber, or CPGA, constant at $89 — the same CPGA we reported in the third quarter last year. These results provide us the flexibility to aggressively advertise and market our service in the fourth quarter. And in fact, that is what we are doing — implementing a comprehensive media campaign comprised of advertisements, rebates and other promotional techniques to fully exploit the holiday selling season again this year.*

XM is clearly the dominant leader in the satellite radio industry with over twice as many subscribers as our competitor. Our subscriber growth continues to set records, even relative to other subscriber businesses because of our healthy positions in both the automotive and retail distribution channels. As in the prior quarter, each distribution channel contributed approximately half of the third quarter's net subscriber growth.

***

*As a result of our strategic building of the OEM channel, we have captured more than 80% of all OEM satellite radio subscribers to date and expect to maintain a dominant leadership position throughout 2006 and beyond in the OEM category.*

Let's turn to the retail distribution channel, where XM continues to lead the industry by adding more then 300,000 net new retail subscribers in the third quarter. All indicators are that we have outperformed our competitor in this third quarter. All the numbers for retail distribution should be in shortly. As you know, both companies have already pre-reported overall net subscriber additions, and XM achieved a 63% market share for the third quarter 2005, which is essentially unchanged from 64% in the prior two periods.

Now let's look at XM's plan for the retail market for the fourth quarter, when we expect this channel to drive the preponderance of our growth as interest in satellite radio peaks during the Christmas season.

Going into the holiday season, XM has the best and most balanced programming with the right radios at the right price, along with a new media campaign designed to attract the next million XM subscribers. XM is offering a broad range of radios, including two new products, the Audiovox XM Xpress and the Delphi XM RoadyXT. For consumers wanting a five-line display screen, the Xpress, a plug and play receiver, is the smallest satellite radio in the category. The RoadyXT, weighing only 2.8 ounces, is the thinnest satellite radio at an attractive $79 price point. In consumer electronics, size does matter and the smaller, thinner the better.

***

So, in summary, the third quarter 2005 represents another quarter of XM market leadership and smart subscriber growth. XM's leadership in the OEM and retail channels resulted in it ending the quarter with more than twice as many subscribers as its competitor, our revenue rapidly increased, cost-effective programming additions broadened our appeal, new products are in flow, and strategic partnerships are on track. We strengthened our foundation for a

- 11 -

spectacular fourth quarter when we will exceed 6 million subscribers and for an exceptional 2006 and beyond.

***

17.    On November 1, 2005, defendants issued a press release entitled "XM SATELLITE RADIO GAINS RETAIL MARKET SHARE IN THIRD QUARTER." The press release stated in part:

> Washington D.C., November 01, 2005 -- XM Satellite Radio (NASDAQ: XMSR) today announced that, based on the latest satellite radio industry subscriber results, XM *increased its retail market leadership with a 59 percent market share in the 3rd quarter compared to 56 percent in the 2nd quarter. The market share figures are based on XM's addition of 305,284 net retail subscribers in the 3rd quarter versus the 209,920 net retail subscriber additions announced by its competitor today. XM's total industry share, which includes retail and new car subscribers, was 63 percent for the 3rd quarter with XM adding 617,152 total subscribers and its competitor 359,294.*

> "XM subscribers represent two out of every three satellite radio customers. Satellite radio is one of the fastest-growing entertainment services ever *and is expected to exceed more than nine million total subscribers by the end of this year,"* said Hugh Panero, XM's President and CEO. "XM continues to expand its leadership position *while adding subscribers at about one-third the cost of our competitor."*

***

## REASONS WHY FALSE AND/OR MISLEADING

18.    Defendants' Class Period statements, including those presented in ¶¶ 13-17 above were false and misleading. In each and every statement, defendants misrepresented the ability of XMSR to reduce its subscriber acquisition costs, necessary to validate their business model and achieve profitability. In reality, defendants' claims about "smart subscriber growth rather than growth at any cost" were a sham. Defendants knew or consciously and recklessly disregarded the fact that XMSR would continue *to make inordinately large expenditures going into the end of the 2005 fiscal year to achieve its heralded goal of 6 million subscribers,* making its claims regarding scalable reductions in subscriber acquisition cost blatantly false and misleading. Finally, it was abundantly clear to defendants that, absent real efforts to control ever-increasing

marketing, promotional and programming costs, an acceleration of subscriber growth was

potentially disastrous, since the Company still lacked ways and means to achieve economies of

scale and an approach to profitability.

## THE TRUTH IS REVEALED

19.    On February 16, 2006, XMSR issued a shocking press release entitled, "XM

SATELLITE RADIO HOLDINGS INC. ANNOUNCES FOURTH QUARTER AND FULL

YEAR 2005 RESULTS; XM TO EXCEED NINE MILLION SUBSCRIBERS AND REACH

CASH FLOW BREAK-EVEN BY YEAR-END 2006 - XM Adds Over 2.7 Million Net

Subscribers in 2005; 2005 Subscription Revenue More than Doubles to $503 Million," which

stated in part:

> Washington D.C., February 16, 2006 -- XM Satellite Radio Holdings Inc. (Nasdaq: XMSR) today reported financial and operating results for the fourth quarter and full year ended December 31, 2005. XM reported sharply higher 2005 revenue, and the Company said it expected to report positive cash flow from operations in the fourth quarter of 2006.
>
> "2005 was a significant growth year for XM in which we added more than 2.7 million net subscribers," said Hugh Panero, President and CEO of XM Satellite Radio. "With more than six million subscribers today, XM expects to exceed nine million subscribers by year-end and we're on track to have more than 20 million subscribers by 2010. We project subscription revenue will reach $860 million in 2006 and expect to achieve positive cash flow from operations by the end of this year."
>
> Panero continued, "Last week, we reinforced XM's position as the premium content leader across all of radio with our announcement of the "Oprah & Friends" channel that will complement our music, talk and sports programming starting in September."
>
> XM ended 2005 with 5,932,957 subscribers, an increase of 84 percent over 2004. Despite an intensely competitive marketplace in the fourth quarter, XM achieved net subscriber additions of 898,315. Later than expected activations from strong holiday sales brought the total to more than six million during the first week of January.
>
> "XM achieved significant growth, added quality content and signed up important new automotive distribution partners in 2005," Panero said. "At the start of 2005, XM had 3.2 million subscribers and led the satellite radio competition by 2.1 million subscribers. Over the course of the year, XM increased that lead to 2.6 million subscribers."

Fourth Quarter and Full-Year Financial Results

For the fourth quarter of 2005, XM reported quarterly total revenue of $177 million, an increase of 113 percent over the $83.1 million total revenue reported in fourth quarter of 2004. XM's full year 2005 total revenue was $558.3 million, an increase of 128 percent over the $244.4 million total revenue recorded in 2004. These quarterly and annual increases in revenue were driven by our significant subscriber growth and increases in average revenue per subscriber in connection with our price increase implemented in the second quarter of 2005.

*For the fourth quarter, subscriber acquisition cost (SAC), a component of cost per gross addition (CPGA) was $89 compared to $64 in the same period last year. CPGA in the fourth quarter was $141 compared to $104 in the same period last year. These increases were primarily due to higher marketing expenses to meet a one-time competitive event in the fourth quarter.* For full year 2005, SAC was $64, a slight increase from $62 in 2004, and CPGA was $109, compared to $100 in 2004. In the first quarter of 2006, XM expects a more normalized market environment and projects that SAC and CPGA will decrease in 2006.

***

20.     The shocking news undermined in the eyes of the investment community reasons to remain bullish about the Company's financial prospects. On the news of February 16, 2006, the price of XMSR shares fell 12.9%, on unusually high volume, falling from $25.25 per share on February 16, 2006, to $21.98 per share on February 17, 2006, for a one-day drop of $3.27 per share, on volume of 33.3 million shares, nearly four times the average daily trading volume.

21.     Immediately following the Company's February 16, 2006 announcement, defendants filed SEC Form 8-K containing the resignation letter of Pierce J. Roberts, Jr., one of the Company's directors. The letter, *expressing Mr. Roberts' longstanding concerns regarding the Company's circumstances regarding various problems, including rapid subscriber growth,* stated in part:

*It has been my pleasure to serve on the Board of Directors of XM for more than 5 years.* The company has achieved many notable successes and overcome numerous seemingly-insurmountable obstacles during this period. It has been great fun to have a minor role in helping you, Hugh and the XM team as the company has grown from its founding concept to become a major firm with rapidly growing numbers of subscribers. There is much in which to be pleased.

*That said, I have been troubled about the current direction of the company and do not believe that it is in the best interest of the company's shareholders. For some time I have made my analyses and observations known*

- 14 -

*in an increasingly vociferous manner to the Board and a number of senior managers of the Company. I am not having any useful effect and I care too much and believe in my own views too much to just "go along".*

Given current course and *speed there is, in my view, a significant chance of a crisis on the horizon.* Even absent a crisis, I believe that *XM will inevitably serve its shareholders poorly without major changes now.* It is clear to me that I cannot be part of the solution and I will not be part of the problem.

Therefore, after a lot of thought and with a great deal of sadness, I tender my resignation to be effective immediately. Thanks and best wishes to the entire XM family.

**\*\*\***

22.    The almost 13% decline in XMSR's stock price on February 16, 2006, at the end of the Class Period, was the direct result of the unraveling of the nature and extent of defendants' fraud finally being revealed to investors and the market. The timing and magnitude of XMSR stock price declines negate any inference that the loss suffered by plaintiff and other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the defendants' fraudulent conduct. While the almost 13% decline of XMSR stock price occurred as defendants' fraud began to be revealed, the Standard & Poor's 500 securities index was flat. The economic loss, i.e., damages, suffered by plaintiff and other members of the Class was a direct result of defendants' fraudulent scheme to artificially inflate XMSR stock price and the subsequent significant decline in the value of XMSR stock when defendants' prior misrepresentations and other fraudulent conduct was revealed.

23.    During the Class Period, defendants knew and concealed that:

(a)    Company reports tracking its rapid growth in 2005 of acquired subscribers, as an indicator of movement towards profitability was false and misleading;

(b)    there was no objective reason to communicate the "smart subscriber growth" as an indication of the Company's achievement of economies of scale, since the Company continued to face extraordinary and unpredictable subscriber acquisition costs;

(c)    there already were discussions amongst the Company's own directors that the Company was on "the wrong track" and potentially headed towards a crisis, as a result of its continuing inability to achieve economies of scale in its subscriber-based business; and

(d)    despite defendants' reliance and use of them for that purpose, the Company's home-grown and highly complex business metrics were unable to accurately account for or predict business trends and progress.

## DEFENDANTS' CLASS PERIOD STOCK SALES

24.    During the Class Period, the following defendants sold their shares in accordance with the following schedule:

| Date | Insider | Shares | Price | Proceeds |
| --- | --- | --- | --- | --- |
| 12/6/2005 | COOK, STEPHEN | 78514 | $28.52 | $2,239,164 |
| 11/10/2005 | HAYWOOD, GEORGE WEAVER | 1254000 | $28.20 | $35,363,000 |
| 11/9/2005 | HAYWOOD, GEORGE WEAVER | 391774 | $28.57 | $11,193,000 |
| 11/8/2005 | HAYWOOD, GEORGE WEAVER | 425226 | $29.13 | $12,387,000 |
| 12/6/2005 | PANERO, HUGH | 413334 | $28.90 | $11,945,353 |
| 12/6/2005 | PATSIAKAS, STELIOS | 103514 | $28.82 | $2,982,890 |
| 12/6/2005 | TITLEBAUM, JOSEPH M. | 103514 | $28.90 | $2,991,555 |
| 8/23/2005 | TOPPENBERG, ERIK | 1134 | $33.42 | $37,898 |
| | Totals | 2771010 | | $79,139,860 |

## APPLICABILITY OF PRESUMPTION OF RELIANCE

## FRAUD-ON-THE-MARKET DOCTRINE

25.    At all relevant times, the market for XMSR securities was an efficient market, for the following reasons, among others:

- 16 -

(a)     XMSR's stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)     As a regulated issuer, XMSR filed periodic public reports with the SEC; and

(c)     XMSR regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services.

26.     As a result of the foregoing, the market for XMSR's securities promptly digested current information regarding XMSR from all publicly available sources and reflected such information in XMSR's stock price. Under these circumstances, all persons who purchased or acquired XMSR's securities during the Class Period suffered similar injury through their purchase of the aforementioned securities at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

27.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of XMSR who knew that those statements were false when made.

- 17 -

## CLASS ACTION ALLEGATIONS

28.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased XMSR publicly traded securities on the open market during the Class Period. Excluded from the Class are defendants.

29.     The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. XMSR had more than 257 million shares of stock outstanding, owned by hundreds if not thousands of persons.

30.     There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class that predominate over questions that may affect individual Class members include:

   (a) Whether the Exchange Act was violated by defendants;

   (b) Whether defendants omitted and/or misrepresented material facts;

   (c) Whether defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

   (d) Whether defendants knew or deliberately disregarded that their statements were false and misleading;

   (e) Whether the prices of XMSR's publicly traded securities were artificially inflated; and

   (f) The extent of damage sustained by Class members and the appropriate measure of damages.

31.     Plaintiff's claims are typical of those of the Class because plaintiff and the Class sustained damages from defendants' wrongful conduct.

- 18 -

32.    Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation.  Plaintiff has no interests that conflict with those of the Class.

33.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

**COUNT I**

**For Violation of § 10(b) of the Exchange Act and Rule 10b-5
Against All Defendants**

34.    Plaintiff incorporates ¶¶ 1-33 by reference.

35.    During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

36.    Defendants violated § 10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)    Employed devices, schemes, and artifices to defraud;

(b)    Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)    Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of XMSR publicly traded securities during the Class Period.

37.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for XMSR publicly traded securities.  Plaintiff and the Class would not have purchased XMSR publicly traded securities at the prices they paid,

or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

38.     As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of XMSR publicly traded securities during the Class Period.

## COUNT II

### For Violation of § 20(a) of the Exchange Act
### Against All Defendants

39.     Plaintiff incorporates ¶¶ 1-38 by reference.

40.     Defendant Panero acted as a controlling person of XMSR within the meaning of § 20(a) of the Exchange Act.  By reason of his position as an officer and director of XMSR, and his ownership of XMSR stock, Defendant Panero had the power and authority to cause XMSR to engage in the wrongful conduct complained of herein.  XMSR controlled Defendant Panero and all of its employees.  By reason of such conduct, Defendant Panero and XMSR are liable pursuant to § 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

A.     Declaring this action to be a class action properly maintained pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.     Awarding plaintiffs and other members of the Class compensatory damages;

C.     Awarding plaintiffs and members of the Class pre-judgment and post-judgment interest, as well as reasonable attorneys' fees, expert witness fees, and other costs and disbursements;

D.    Awarding extraordinary, equitable and/or injunctive relief as permitted by law, equity and the federal statutory provisions sued hereunder, pursuant to Rules 64 and 65 and any appropriate state law remedies to assure that the Class has an effective remedy; and

E.    Awarding plaintiffs and other members of the Class such other relief as this Court may deem just and proper under the circumstances.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated:  May 10, 2006

Respectfully submitted,

FORTNEY SCOTT

Burton J. Fishman (D.C. Bar ID 290478)
1750 K Street, NW
Suite 325
Washington, D.C. 20006
Tel.: 202.689.1200
Fax: 202.689.1209

SCOTT + SCOTT, LLC
David R. Scott
Erin Green Comite
108 Norwich Avenue
Colchester, CT  06415
Tel.: 860.537.5537
Fax: 860.537.4432
-and-
Arthur L. Shingler III
600 B Street, Suite 1500
San Diego, CA  92101
Tel.: 619.233.4565
Fax: 619.233.0508